UNITED STATES OF AMERICA
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal Nos: |
| v. | |
| JUAN ANIBEL PATRONE, et al., ) | |
| ) | 17-cr-10141-DPW |
| Defendants ) | |
| ) | |
| | |
| RAMON GONZALEZ NIVAL, et al., ) | |
| ) | 17-cr-10142-DJC |
| Defendants ) | |
| ) | |
| | |
| CAONABLO MAYOBANEX POL ) | |
| MONTERO, et al., ) | |
| ) | 17-cr-10140-LTS |
| Defendants ) | |
| ) | |

## AFFIDAVIT REGARDING DETENTION ISSUES

I, Garth Hamelin, being duly sworn, hereby depose and state as follows:

1.     I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7), and am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

2.     I have been employed as a Special Agent of the United States Drug Enforcement Administration ("DEA") since 2002. I am currently assigned to the DEA's New England Field Division, where I have been since September 2007. I was previously assigned to the Dallas Field Division, Oklahoma City District Office, where I primarily investigated organized narcotics traffickers. Over the course of my career as a DEA Special Agent, I have participated in numerous narcotics investigations, including at least ten federal wiretap investigations of narcotics-

trafficking organizations involved in domestic and international importation and distribution of kilogram amounts of cocaine, heroin, fentanyl and methamphetamine.

2.      Before joining the DEA, I served as a police officer with the Manchester, New Hampshire Police Department, and the Los Angeles Police Department.  I have a Bachelor of Science Degree in Criminal Justice from Northeastern University.

3.      During the course of my employment with the DEA, I have received specialized training regarding the activities of narcotics traffickers, including the methods used to package, store, and distribute narcotics, and the methods used by narcotics traffickers to conceal and launder the proceeds of their narcotics-trafficking activities.   Over the course of my career in law enforcement, I have debriefed numerous defendants, informants, and witnesses with personal knowledge about narcotics trafficking and the operation of narcotics-trafficking organizations.  I have personally participated in all aspects of narcotics-trafficking investigations, including conducting surveillance, using confidential informants, acting in an undercover capacity, and conducting court-authorized interceptions of wire communications, and preparing and executing arrest and search warrants.

4.      Based on my training and experience, I am familiar with methods of operation used by narcotics traffickers, including the methods they use to distribute, store, and transport narcotics, and to collect, expend, account for, transport, and launder drug proceeds.  Specifically, I am familiar with the manner in which narcotics traffickers use vehicles, common carriers, mail and private delivery services, and a variety of other means to transport and distribute narcotics and the proceeds of narcotics trafficking.

5.      Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate and further their drug-trafficking activities.  However,

drug traffickers are aware of law enforcement's use of electronic surveillance, and thus frequently endeavor to thwart detection by changing cellular telephone numbers, using multiple cellular phones at the same time, and/or utilizing prepaid cellular phones where the user of the phone is not required to provide personal identifying information. I am also aware that drug traffickers frequently "drop" or change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance. I am familiar with the manner in which narcotics traffickers use telephones, coded, veiled, or slang-filled telephone conversations when discussing their illegal business, in an effort to further prevent detection, and often use text messages or messaging applications like BlackBerry Messenger (BBM) and WhatsApp in lieu of phone calls to avoid speaking over the telephone. I have been involved in the preparation and execution of hundreds of arrest warrants and search warrants in my career.

6.      I have participated in the below-described investigation since June 2016. I am familiar with the facts and circumstances of this investigation based on information I have received from a variety of sources, including other law enforcement officers and agents, confidential sources, cooperating witnesses, public records, financial records, physical and video surveillance, telephone toll records, and court authorized wire intercepts. This affidavit is submitted for the limited purpose of setting forth some broad overview factors that apply to the detention hearings in these cases. I anticipate that for specific defendants for whom detention hearings are held, there will be additional evidence presented at that time.

## BACKGROUND OF THE INVESTIGATION

7.      **Summary of Investigation.**  In April 2016, a confidential source (hereafter, CS-1)[1] began providing information to the Drug Enforcement Administration (DEA) about a drug trafficking organization (DTO) operating in the Lawrence, Massachusetts area, run by Juan Anibel Patrone (PATRONE), a Dominican believed to be unlawfully in the United States.  CS-1 explained generally that the PATRONE DTO worked seven days a week, that PATRONE had a customer line (TT#1) which customers contacted for drugs, and that PATRONE dispatched couriers and arranged for drugs to be supplied from the stash house on two additional telephones (TT#2 and TT#3).  The stash house phone, TT#4, remained in the stash house and TT#4 was used by whomever was operating the stash house.  CS-1 explained that PATRONE used couriers who made deliveries both in cars and on foot.  Based on intercepted calls, PATRONE distributed drugs to customers throughout Massachusetts, New Hampshire, and Maine.  Additional CSs came forward and provided information that confirmed the information provided by CS-1 about the operation of the PATRONE DTO, its couriers, stash houses, and phone numbers.

8.      On each of May 20, 2016, and June 7, 2016, CS-1 made a controlled purchase of approximately 10 grams of heroin from the PATRONE DTO at the direction of investigators.  Laboratory results showed the product received was fentanyl.  On September 1, 2016, CS-1 introduced an undercover officer (hereafter, UC) to PATRONE, and on each of September 1, 2016 and September 23, 2016, the UC made a controlled purchase of approximately 10 grams of "brown" and varied amounts of "white" from the PATRONE DTO.  Laboratory results showed the products received were fentanyl and cocaine.

---

[1] CS-1 was deactivated in October 2017, after CS-1 reported having a drug relapse, and a review of toll records showed that CS-1 was minimizing his interaction with the DTO.  CS-1 is again obtaining drugs through the PATRONE DTO.

9.      During 2016, several of PATRONE's couriers were arrested and suspected fentanyl/heroin and cocaine was seized.  On May 3, 2016, Norberto MANON, a courier for PATRONE was arrested and approximately 58 grams of suspected heroin/fentanyl and 32 grams of suspected cocaine was seized.  On August 18, 2016, Derek RICHARDS, another courier for PATRONE, was arrested and approximately 10 grams of suspected heroin/fentanyl and nine grams of suspected cocaine was seized. Because of the danger to law enforcement officers from air-borne fentanyl, the drugs are no longer tested in the field; as a result, laboratories are significantly backed-up, even on rush requests.  The laboratory results are not yet back for the MANON and RICHARDS seizures. On September 29, 2016, Lionel VIVES and Carlos Reyes, couriers for PATRONE, were arrested and approximately 25 grams of fentanyl/heroin and 25 grams of cocaine was seized.  Laboratory results show the VIVES seizure was comprised of 23.7 grams of fentanyl and 22.75 grams of cocaine.

10.      **Wire and Electronic Interceptions.**  After gathering and analyzing evidence in an attempt to track the activity of the PATRONE DTO, I ultimately obtained six orders to intercept wire (and in some cases electronic) communications occurring over eleven telephones, three of which were used by PATRONE (TT#1, TT#2, and TT#3); one of which was used by the stash house operators Joseul Moises Patrone Gonzalez (KIKO) and OSCAR (TT#4); four of which were used by a drug supplier to PATRONE who operated his own separate DTO, CABALLITO (TT#5, TT#6, TT#9, and TT#11); one of which was used by a drug supplier to PATRONE who also has separate customers, Caonablo Mayobanex Montero (BANI) (TT#7); and one of which was used by a drug supplier Jose Rosado Sanchez (CHIQUITO) (TT#10).  The intercepted telephones were as follows:

| TT#1 | (978) 908-7197 | PATRONE customer line | 12/2/2016 to 12/31/2016 |
| TT#2 | (978) 907-2289 | PATRONE runner line | 12/2/2016 to current |
| TT#3 | (978) 429-5585 | PATRONE supplier line | 12/2/2016 to current |

| TT#4 | (978) 390-2232 | PATRONE's stash house line; used by KIKO or OSCAR, depending on who operated the stash house. | 12/2/2016 to 2/22/2017 |
|------|----------------|-----------------------------------------------------------------------------------------------|------------------------|
| TT#5 | (603) 854-4049 | CABALLITO - drug supplier/DTO | 2/1/2017 to 4/27/2017 |
| TT#6 | (603) 264-3857 | CABALLITO - drug supplier/DTO | 2/1/2017 to 4/5/2017 |
| TT#7 | (603) 209-5306 | BANI - drug supplier | 2/1/2017 to 4/2/2017 |
| TT#8 | REDACTED | REDACTED | REDACTED |
| TT#9 | (404) 528-6550 | CABALLITO - drug supplier/DTO | 3/31/2017 to 5/5/2017 |
| TT#10 | (818) 210-9455 | CHIQUITO – drug supplier | No interceptions, dropped |
| TT#11 | (401) 368-2765 | CABALLITO – drug supplier/DTO | 5/5/2017 to current |

The specific wire authorizations obtained were as follows:

A.    On November 30, 2016, the Honorable United States District Court Judge Indira Talwani signed an Order authorizing the interception of wire communications to and from Target Telephones #1 through #4. 16-MC-91357-IT. Interceptions began on December 2, 2016 and continued until December 31, 2016. The recorded interceptions were sealed on January 3, 2017.

B.    On January 6, 2017, Judge Talwani signed an Order authorizing the interception of wire and electronic communications to and from Target Telephones #2 through #4. Interceptions began on January 6 and continued until February 1, 2017. The recorded interceptions were sealed on February 2, 2017.

C.    On February 1, 2017, Judge Talwani signed an Order authorizing the interception of wire and electronic communications to and from Target Telephones #2 through #4, and also authorization the interception of wire communications to and from Target Telephones #5 through #7.  The recorded interceptions were sealed on March 3, 2017.

D.    On March 2, 2017, Judge Talwani signed an Order authorizing the interception of wire and electronic communications to and from Target Telephones #2, #3, #5, #6, and #7, and wire communications to and from Target Telephones #4 and #8. That authorization expired on April 1, 2017, and the recorded interceptions were sealed on April 3, 2017.

E.    On March 31, 2017, Judge Talwani signed an Order authorizing the interception of wire and electronic communications to and from Target Telephones #2, #3, #5, #6, #8, #9, and #10, and wire communications to and from Target Telephones #2, #3, #6, and #8.  Authorization for those interceptions expired on April 30, 2017, and the recorded interceptions were sealed on May 1, 2017.

F.    On May 5, 2017, Judge Talwani signed an Order authorizing the interception of wire and electronic communications to and from Target Telephones #2 and #3, and wire communications to and from Target Telephones #8, #9, and #11. Authorization for those interceptions will expire on June 4, 2017.

11.    **Wire and Electronic Interceptions Confirmed the PATRONE DTO, Discovered the CABALLITO DTO, and Identified Drug Suppliers to both DTO's.**  The interceptions to date, together with supporting search warrants, surveillance, and seizures, confirmed the broad outlines of the PATRONE DTO, as described by CSs.  The investigation uncovered a second DTO, run by CABALLITO.  CABALLITO supplied PATRONE with narcotics, and also ran his own DTO, described further below.  The investigation also uncovered additional suppliers of narcotics to both PATRONE and CABALLITO, including BANI, GUEVA, and CHIQUITO, among others.

12.    **Interceptions Over TT#1 – TT#4 Confirmed the Existence of the PATRONE DTO.**  In brief summary, as further described below, the interceptions to date, together with surveillance and drug seizures, established that the following persons have the roles in the PATRONE DTO that are set forth on Attachment A, hereto.  The DTO is run by PATRONE. PATRONE obtained drug supply from Domingo Gonzalez Martinez (GUEVA), CABALLITO, and others.  The operators of the stash house for PATRONE were primarily his brother, Josuel Moises Patrone-Gonzalez (KIKO), and Oscar Francisco Marcano Valverde (OSCAR), until OSCAR was recently held in jail after being arrested with a firearm.  Luis LUGO was a manager for PATRONE who supervised a crew of couriers, and acted as a courier himself.  Generally,

PATRONE directed couriers to pick up their supply of narcotics toward the end of the week each week to store either at their homes or in hides in their cars for drug deliveries as needed over the next few days. As the couriers required drug re-supply the following week, PATRONE coordinated those additional pick-ups with the stash house operators. The couriers charged in this case include Andreury Fana Burgos (FANA), Victor Alexander Gonzalez-Gonzalez (ALEX), Luis A. Perez-TOMASSINI, Leonel VIVES, and Daniel DIAZ. PATRONE sold his narcotics through several redistributors including Reynaldo Duran Lora (REYNALDO), Lacey PICARIELLO, Matthew SHOVER, Rafael Omar Arias-Rodriguez (TITA), Rafael ARCE, Stacey LITTLEFIELD, and Melvin WEATHERSPOON. Euclides ALCANTARA was a facilitator for PATRONE who insured cars, carried drug proceeds, bailed out arrested couriers, and generally performed tasks as directed by PATRONE.

13. **Interceptions Over TT#5, TT#6, TT#9, and TT#11 Uncovered the CABALLITO DTO.** In brief summary, as further described below, and as set forth in the chart that is Attachment B, the interceptions to date, together with surveillance and drug seizures, established that CABALLITO supplied drugs to PATRONE. In addition, CABALLITO ran his own drug trafficking organization. CABALLITO obtained drugs from, among others, Jose Rosado Sanchez (CHIQUITO), FNU/LNU, a/k/a TIO, and GUEVA. CABALLITO used a manager to process drugs and assist in deliveries, Julio Baez Gonzalez (MANOLO). One of his couriers was Ruddy Rafael Soto Lara (PEJE). Another courier who worked for CABALLITO was Geronimo Confesor Gonzalez Nivar (ALEXIE). CABALITTO used several redistributors including Carlos HERNANDEZ, Rory CONNOLLY, Bernaldo Rosario Santiago (BORI), and Diosmary BURGOS.

14. **Interceptions Over TT#3 and TT#7 Identified BANI as a Drug Supplier.** As further described below, and set forth on Attachment C hereto, the interceptions to date, together with surveillance and drug seizures, have established that Caonabo Mayobanez Pol Montero (BANI) supplied drugs to PATRONE and others, including redistributor Shawn KEEFE, during the period of authorized interceptions.

15. **Indictments Returned by the Grand Jury on May 24, 2017.** On May 24, 2014, a grand jury in the District of Massachusetts returned three sealed indictments against the persons described above for conspiracy to possess with intent to distribute fentanyl, heroin, and cocaine, and related illegal re-entry and alien in possession of firearm/ammunition charges, where appropriate. The indictments were returned against (1) members of the PATRONE DTO, (2) members of the CABALLITO DTO, and (3) BANI and his redistributor.

A. The PATRONE indictment charges those persons set forth in Attachment A with a conspiracy to possess with intent to distribute heroin, cocaine and fentanyl in violation of 21 U.S.C. § 846. In addition, OSCAR was charged with being an alien unlawfully present in the United States in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(5)(A). 17-cr-10141-DPW.

B. The CABALLITO indictment charges those persons set forth in Attachment B with a conspiracy to possess with intent to distribute heroin, cocaine and fentanyl in violation of 21 U.S.C. § 846. In addition, ALEXIE was charged with being an alien unlawfully present in the United States in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(5)(A); and PEJE was charged with unlawful re-entry of a deported alien, in violation of 8 U.S.C. § 1326. 17-cr-10142-DJC.

C. The BANI indictment charges those persons set forth in Attachment C with a conspiracy to possess with intent to distribute heroin, cocaine and fentanyl in violation of 21 U.S.C. § 846. In addition, BANI was charged with unlawful re-entry of a deported alien, in violation of 8 U.S.C. § 1326. 17-cr-10140-LTS.

16. **Presumption Against Release.** Each of the defendants in each of the three indictments referenced above were charged with drug trafficking crimes for which a maximum

term of imprisonment of ten years or more is prescribed in the Controlled Substances Act, and accordingly, the presumption applies that there is no condition or combination of conditions that will reasonably assure the appearance of the persons as required and the safety of the community.  18 U.S.C. § 1342(e)(3)(A).

17.   **Nature and Circumstances of the Offense Charged (Trafficking Fentanyl).**

Each of these defendants is charged with drug trafficking heroin, cocaine, and fentanyl. Fentanyl is a particularly dangerous substance that has been linked to multiple overdose deaths. See, e.g., http://www.mass.gov/eohhs/docs/dph/stop-addiction/current-statistics/data-brief-overdose-deaths-nov-2016-ma-residents.pdf  Fentanyl is a synthetic opioid that has effects similar to heroin.  In Massachusetts, among the 693 individuals whose deaths were opioid-related in 2016 where a toxicology screen was also available, 510 of them (74%) had a positive screen result for fentanyl.[2]  As indicated above, the laboratory results which have been received confirm that fentanyl was being distributed by the PATONE DTO.  I also believe that CABALLITO is distributing fentanyl based upon his description in intercepted calls of how much cut or additive should be added to narcotics being prepared for distribution to avoid "killing people."  By way of example:

A.   On May 5, 2017, at approximately 7:31 p.m. (Session 56), CABALLITO made an outgoing call on TT#11 to (603) 858-0478, and spoke to TIO. CABALLITO said, "Oh, that little blue one, did you check it?"  TIO said, "No."  CABALLITO said, "What did they tell you?"  TIO said, "That's

---

[2] "While screening tests can be used to note the rate at which certain drugs are detected in toxicology reports, screening tests are insufficient to determine the final cause of death without additional information.  The case of death is a clinical judgment made within the Office of the Chief Medical Examiner."  *Data Brief:  Opioid-related Overdose Deaths Among Massachusetts Residents,* Massachusetts Department of Public Health, p. 2 (November 2016).

killing people." CABALLITO said, "Yeah." TIO said, "Listen, that's killing people, I already told you. CABALLITO said, "I check it already…because I gave it to someone who is very picky; I gave it to them at nine, and it passed." CABALLITO said, "A friend of mine told that the blue one is good, but it kills a lot of people [chuckles]." Based on my training and experience and knowledge of this investigation, "blue" appears to refer to a narcotic called "blue fentanyl," which CABALLITO provided in a 9:1 ratio of additive to the narcotic ("gave it to them at a nine"), to cut the drug sufficiently that it didn't "kill people."

B.      On May 16, 2017, at approximately 1:49 p.m. (Session 3451), CABALLITO placed an outgoing call on TT#11 to (603) 858-0478, and spoke to TIO. CABALLITO said, "And the people are asking me for the little blue one." TIO said, "Oh but everyone…that's what people are waiting on me for." CABALLITO said, "Yes, the little blue one." TIO said, "I'm waiting for the people to see if they call me between today and tomorrow." CABALLITO said, "Are they going to give that one?" TIO said, "Yes, because I met with them…" TIO said, "it's a little bit more expensive that the other one, but it doesn't matter." CABALLITO said, "…that blue one…after one squares it away…how should it go…one can put 20 on top to square it away, and it passes. . . . that blue one is dangerous." TIO said, "but there's another one stronger than that one too…a pink one." CABALLITO said, "I was even scared of that one." Based on my training and experience, "one can put 20 on top" likely means the amount of cut or additive that can be added to the "blue one" without hurting the quality of the narcotics for customers.

18.     **History and Characteristics – Defendants Unlawfully Present in the United States:  Risk of Flight.**

Of those defendants who were identified at the time the indictments were returned, and whose A-files were able to be obtained in time, nine were unlawfully in the United States. Each of these nine persons unlawfully present in the United States were Dominican nationals:

**PATRONE Indictment:**

(1)     Juan Anibel Patrone;
(3)     Oscar Francisco Marcano Valverde;
(6)     Victor Alexander Gonzalez-Gonzalez;
(10)    Santo Marino Nivar-Tejeda;

**CABALLITO Indictment:**

(1)    Ramon Gonzalez Nival;
(3)    Julio Baez Gonzalez;
(4)    Ruddy Rafael Soto Lara (illegal re-entry after deportation);
(5)    Geronimo Confesor Gonzalez Nivar;

**BANI Indictment:**

(1)    Caonabo Mayobanex Pol Montero (illegal re-entry after deportation).

Several of the remaining defendants are suspected to be using false names, something the government is endeavoring to determine before the detention hearings are held, so additional defendants may be unlawfully in the United States. In addition, there may be other factors that present a risk for flight which are not herein addressed.

19.    **Nature and Seriousness of the Danger to the Community From Release. (Firearms and Violence).**

In addition to the fact that these defendants were trafficking in deadly fentanyl and other narcotics in the Lawrence and surrounding areas, during the course of this investigation, two defendants were charged as being aliens unlawfully present in the United States with firearms and ammunition (Oscar Francisco Marcano Valverde – Defendant #3, PATRONE Indictment; and Geronimo Confesor Gonzalez Nivar – Defendant #5, CABALLITO Indictment). On multiple occasions, these defendants were intercepted discussing the need to buy, keep, and use guns to protect their drug trafficking business. For example:

A.    On January 13, 2017, PATRONE spoke to OSCAR (TT#3, Session 18089), and OSCAR complained that he was afraid someone wanted to rob him. PATRONE asked him where he had the gun. OSCAR said, "Underneath my bed."

B.    On March 1, 2017, BORI was stopped in a motor vehicle stop at a storage lot following surveillance of a drug transaction. BORI allowed officers to search his storage locker, where a stolen .40 caliber Springfield Arms

serial #XD375544 loaded with 1 magazine containing 11 rounds, and a .25 caliber Phoenix Arms serial #4376613 loaded with three rounds of ammunition were seized.

C.    On March 16, 2017, (TT#3, Session 53105), PATRONE called LUGO, and only the background conversation was heard.  LUGO was overheard saying, "We all got guns, we could do that right now, think about it."  The unknown male was overheard saying, "We all shoot my nigga, whoever come…we definitely going to kill, my nigga."

D.    On April 27, 2017, at approximately 12:22 p.m. (TT#3, Session 50268), PATRONE placed an outgoing call to (978) 489-5074, and spoke to OSCAR.  PATRONE said, "Did you go pick up the thing at Alex's dad?"  OSCAR said, "I'm here preparing that thing that I'm going to bring over to Alex.. . .as soon as I get to Alex, I'll go pick it up."  At 10:13 p.m. (TT#3, Session 70690), PATRONE received an incoming call from (978) 439-5074, and spoke to OSCAR.  OSCAR said, "Bro, am I bring that to you, right?"  PATRONE said, "Do you have that with you?"  OSCAR said, "No, he called me already."  PATRONE said, "Well then go ahead. I am here, *so that you can bring it over here at once."*  [Emphasis added].  Investigators followed OSCAR, who used his wife's car, and a motor vehicle stop was conducted.  OSCAR was arrested, and a Colt combat commander .45 handgun serial #705C34562 with seven rounds of ammunition was seized.  At 10:46 p.m. (TT#3, Session 70693), PATRONE received an incoming call from (978) 489-5074, and spoke to an unknown female (UF) who identified herself as OSCAR's wife.  She said, "Who's this?"  PATRONE said, "This is Poppo."  UF said, "Hi Poppo, Listen, they stopped us and they took him with what he was going to bring to you!"  PATRONE said, "How can that be?"  UF said, "Yes, just now, near your house."  PATRONE said, "Yes, they will give him bail, that's no problem."  UF said, "But it's a firearm, possession of a firearm!"  A photograph of the seized weapon follows:



E.   On May 8, 2017, KIKO and PATRONE discussed the need to be armed because of concerns about thieves and robbers. (TT#3, Session 73212). PATRONE said that "now he will hang around with his gun again," and said "that he will buy a smaller one."

F.   On May 10, 2017, PATRONE placed an outgoing call to Robertico (TT#2, Session 9839), PATRONE told Robertico that he had his gun over at KIKO's, but now because of thieves in the area, he has "it on him 24/7."

G.   On May 10, 2017, FANA attempted to broker the sale of two assault rifles to PATRONE.  On May 10, 2017, at approximately 11:11 a.m. (Session 73791), PATRONE received an incoming call on Target Telephone #3 from (978) 332-4933, and spoke to FANA.  FANA said, "Listen bro....do you buy big things?"  PATRONE said, "Why?"  FANA said, "Because they were selling me a really good apparatus."  PATRONE said, "At how much?"  FANA said, "For 900, an A47."  PATRONE said, "Send me a picture."  At approximately 12:33 p.m. (Session 73866), PATRONE received an incoming text from (978) 332-4933, that said, "There's two, 900 each."  FANA sent the following pictures to PATRONE:




At approximately 5:27 p.m. (Session 73996), PATRONE received an incoming call on Target Telephone #3 from (978) 332-4933, and spoke to FANA. FANA asked, "What's up." PATRONE said "That's too expensive." Based on my training and experience and knowledge of this investigation, FANA attempted either to sell or to broker a deal to sell PATRONE two AK-47 rifles for $900 each. PATRONE decided they were too expensive and did not buy them.

H.  On May 23, 2017, PATRONE placed an outgoing call on TT#2 and spoke to an unknown female. PATRONE began talking about guns. PATRONE said, "I have misplaced one here in the house and can't find it. I have one here [United States]. Over there [Dominican Republic], I have a few. . . .The one OSCAR was arrested with was also mine…that one was really nice." The UF asked, "What was he doing with it?" PATRONE said, "It was that Alex's dad had it. I had it picked up. He so stupid that it was packed in a fucking backpack."

## WEIGHT OF THE EVIDENCE AGAINST THE DEFENDANTS

20.  **PATRONE DTO.** Intercepted calls confirm that PATRONE operated his DTO as a business. He used TT#1 as a dispatch telephone, primarily for the purpose of obtaining customer orders, and directing customers to locations to receive the drugs. During December 2016, literally thousands of calls were intercepted of customers ordering drugs, followed thereafter by PATRONE directing customers to locations to receive drugs. PATRONE used TT#2 and TT#3 to direct processing of the drugs, delivery of the drugs to couriers, to coordinate courier deliveries to customers, to account for proceeds of the drug transactions, to obtain additional drug supply, and to discuss the drug trafficking business with friends and family. Those calls are set forth throughout this section of my Affidavit. With regard to the value of the drug trafficking business of the PATRONE DTO generally, PATRONE was intercepted as follows:

A.  On December 6, 2016, at approximately 11:47 p.m. (Session 192-V), PATRONE placed an outgoing call on Target Telephone #2 to (809) 380-2812, and spoke to "Rafi." PATRONE said that he is going to "hold on awhile longer," and that he was going "to plant 50,000 plantain trees in the land that he bought [in the Dominican Republic] because he needs to keep

15

his money active." PATRONE said that yesterday, he only got "10 something," and that today, he "only sold like 8 or 9," and said that things "are slow." Based on my training and experience and knowledge of this investigation, I believe that PATRONE indicated he was going to work "awhile longer" in the drug business in Lawrence, that he made only $10,000 something yesterday ("10 something") and that today, he only made $8,000 or $9,000 ("only sold like eight or nine").

B.   On February 15, 2017, at approximately 3:13 p.m. (Session 38217), PATRONE received an incoming call on TT#3 and spoke to TITA. PATRONE said, "I bought two houses and the last one that I bought was Severino's, and the other was one near where Abraham lives. . . I am doing a couple houses [on land I bought by Matadero out by the woods], and will do one in my grandmother's land. I am out of here. I am leaving….I will never deal with drugs again in my life." Based on my training and experience and knowledge of this investigation, PATRONE discussed his investments from his drug money in the Dominican Republic, and how when he returned to the Dominican Republic, he would be out of the drug trafficking business.

21.   The intercepted calls regarding drug trafficking on TT#1, TT#2, and TT#3 were confirmed with surveillance and seizures. Examples follow:

A.   On December 21, 2016, SHOVER, a redistributor, spoke to PATRONE multiple times to order drugs, to set up a meet location at Market Basket in Methuen, and to coordinate the delivery with PATRONE's courier, ALEX. (TT#1, Session #s 11839, 11928, 11929, 11939, 11944, 11948, 11951, 11955, 11956, 11958, 11960, 11963, 11972, 11974, 11975, 11981, 12002, 12047, 12047, 12066, 12067, 12071, 12072, 12074, 12076, 12077, 12079, 12080, 12081, 12083, 12084, 12085, 12086, 12088). Also intercepted were calls arranging for ALEX to transport the drugs. (TT#2, Session #s 401, 402; TT#3, Session #s 8037, 8047, 8104, 8149, and 8154). On December 21, surveillance observed a Chrysler Minivan pull into a Market Basket parking lot. Officers watched the driver and passenger, later identified as SHOVER and his sister, Samantha Shover, walk into the store. A call was intercepted on TT#3 in which ALEX told PATRONE to have SHOVER go to the bathroom. Officers observed SHOVER on his cellphone, looking around, asking Market Basket staff where the bathroom was. Officers watched SHOVER and his sister go through swinging doors to the back, where the bathroom was located. Approximately 30 seconds after SHOVER and his sister went through the swinging doors to the bathroom, officers saw a Hispanic male, later identified as TOMASSINI, a courier for the DTO, exit through the swinging doors. ALEX then went

through the swinging doors.  Moments later, SHOVER and his sister exited through the swinging doors and walked toward the front of the store.  Officers followed SHOVER in his Chrysler Minivan, and shortly thereafter stopped the vehicle, recovering approximately 135 grams of suspected heroin/fentanyl and $7348.  Based on the calls and surveillance, I believe that TOMASSINI collected money for the drugs, and then ALEX supplied the drugs, after which the SHOVERs left the store.

B.  On February 16, 2017, interceptions included multiple calls regarding delivery of cocaine and heroin to a female redistributor, PICARIELLO. (TT#3 – Sessions 38857, 38870, 38871, 38873, 38874, 38876, 38877, 38884, 38891, 38894, 38903, 38094, and 38095).   PATRONE instructed his courier, ALEX, to supply a female customer, later identified as Lacey PICARIELLO, with 40 grams of heroin and 10 grams of cocaine.  Officers observed the transaction.  PICARIELLO then drove away in a 2016 white Audi, Massachusetts Registration 4KT221.  After learning the registration had been revoked because of insurance cancellation, Massachusetts State Troopers stopped the vehicle, during which stop PICARIELLO handed over seven plastic bags of suspected heroin/fentanyl, and one plastic bag of suspected cocaine.  During a search of the car, a black bag was located that contained, among other things, a digital scale, a bag of elastics, four bags of suspected heroin/fentanyl, and $3,105 in a ziplock bag and an envelope.

C.  On March 18, 2017, intercepted calls indicated that a courier, MELLO, was instructed by PATRONE to supply drugs to a female on Custer Street (later identified as Mollie Schooley). (TT#2, Sessions 2092, 47920, 47922, 47925, 5987, 5992, 5993, 5994, 5995, 5996, 6004, 6008, 6010, 6013; TT#3, 53781, 53782, 53790, 53791, 53804, 53806, 53809, 53811, 53814, 53181, 53822, 53825, 53826, 53830, 53831, 53833, 53834, 53846, 53853, 53854, 53860, 53865, 53868, and 83997).  The exchange was observed, and investigators conducted a car stop on Mollie Schooley and Eric Brophy's vehicle.  Schooley confirmed that she had just bought heroin for approximately $150.  Investigators then arrested MELLO, and found approximately $160 on his person.  In later intercepted calls on TT#3, PATRONE sought help posting bail for Schooley, and gave her $100 because she did not make any damaging statements to investigators.

D.  On April 3, 2017, OSCAR, a part-time stash house operator for PATRONE, called PATRONE, and said he was going "to prepare some . . . at least 35," because ALEX called.  PATRONE then called ALEX and said a girl is looking for "14 fives."  Based on my training and experience and knowledge of this investigation, "35" means 35 five-gram bags, and

"14 fives" means 14 five gram bags or 70 grams of suspected heroin/fentanyl. PATRONE then coordinated a meeting among OSCAR, ALEX, and "the girl" in order to sell her "7 fingers," or 70 grams, for "$2,240." (TT #3, Session #s 60762, 60764, 60767, 60768, 60770, 60775, 60777, 60780, 60783, 60784, 60788, 60789, 60791). After observing the exchange, agents seized 60 grams of suspected drugs from redistributors Melvin WEATHERSPOON, Stacey LITTLEFIELD, and Douglas Littlefield, all of whom were arrested. Investigators suspected that WEATHERSPOON hid the remaining 10 grams in a body cavity, but WEATHERSPOON refused treatment at the hospital.

22.     **Caballito DTO.** Intercepted calls on TT#5, TT#6, TT#9, and TT#11, confirmed by surveillance and seizures, showed that Ramon Gonzalez Nival (CABALLITO), supplied drugs to PATRONE and others, and ran his own DTO. CABALLITO purchased drugs from CHIQUITO, GUEVA, TIO, and others. MANOLO was his main manager and courier. CABALLITO also used ALEXIE and PEJE as couriers. His redistributors included HERNANDEZ, CONNOLLY, BURGOS, and BORI. For example:

A.     On January 14, 2017, at approximately 12:06 p.m. (Session 18295), PATRONE received an incoming call on Target Telephone #3 from Target Telephone #6, and spoke to CABALLITO. CABALLITO said, "I have 500 pesos left to see if you wanted it, you know, the same as the other." PATRONE chuckled. CABALLITO said, "It is the good stuff not the stuff, not lies, not like GUEVA's one." PATRONE said, "Man, when I took 500 from you, I still had 400 bad ones from GUEVA…and with that, I was fixing them. I didn't do much from yours." Based on my training and experience and knowledge of this investigation, CABALLITO told PATRONE he had 500 grams ("500 pesos") left of good quality drugs ("the good stuff"), and he wanted to know if PATRONE wanted the drugs.

B.     On February 25, 2017, (TT#5, 6814, 6822, 6823, 6826, 6829, 6842) CABALLITO spoke to CHIQUITO, his drug supplier, and MANOLO, his drug processor and manager, and agreed to meet at CABALLITO's stash house at 151 Beacon Street in Lawrence, Massachusetts. They agreed to exchange 700 grams of cut that CHIQUITO wanted, for an undetermined amount of narcotics from CHIQUITO. At approximately 6:58 p.m., (TT5, 6861) CABALLITO called CHIQUITO and told him the "work is killer,"

18

to which CHIQUITO responded, "of course, primo, that stuff is major league."

C.      Some of the drugs referred to in the preceding paragraph were seized from two of CABALLITO's redistributors. On February 25, 2017, Carlos HERNANDEZ and Rory CONNOLLY were arrested, and about 120 grams of heroin/fentanyl and $300 was seized. Calls were intercepted calls between CABALLITO and HERNANDEZ, setting up the sale. (TT#5, Sessions 6567, 6692, 6705, 6811, 6852, 6856, 6890, 6891, and 6894). In brief, HERNANDEZ complained to CABALLITO about the poor quality of narcotics that HERNANDEZ had previously purchased from CABALLITO. HERNANDEZ intended to return "six," and wanted to buy "twelve," packaged as "three, four, and five." I believe that HERNANDEZ was returning 60 grams of heroin ("six" or six fingers), and wanted 120 grams of heroin ("twelve" or twelve fingers), packaged together in 30 grams ("three" or three fingers), 40 grams ("four" or four finger), and 50 grams ("five" or five fingers), most likely to make them easier to conceal. Investigators saw HERNANDEZ arrive at CABALLITO's stash house at 151 Beacon Avenue, Lawrence, Massachusetts, go inside for less than a minute, and then exit the building, return to his car, and drive away. At the direction of investigators, the Massachusetts State Police stopped the vehicle. HERNANDEZ was arrested on an outstanding arrest warrant, and Mirandized. A Trooper searched HERNANDEZ and located a hard object in his waist area that contained four finger-type objects wrapped in green cellophane. Each object contained a tan substance believed to be heroin or fentanyl. HERNANDEZ said it was cocaine. A K-9 unit arrived shortly after and alerted to the presence of narcotics on the rear seat of the car. A Trooper located $300 stuffed into the rear seat of the vehicle. During booking, a Trooper located and seized another five fingers of suspected heroin wrapped in green cellophane that was hidden on HERNANDEZ's body. HERNANDEZ's passenger, Rory CONNOLLY, was also arrested during the stop, Mirandized, and searched. Another three fingers of suspected heroin/fentanyl was located hidden on CONNOLLY, which fingers were also wrapped in green cellophane.

23.     **Bani DTO.** Intercepted calls, supported by a seizure and surveillance confirmed that Caonabo Mayobanex Pol Montero, a/k/a BANI, distributes narcotics in the Lawrence area.

A.  On February 7, 2017, at approximately 9:20 a.m. (Session 243), BANI received an incoming call on Target Telephone #7 from (603) 234-4309, and spoke to UM4309. UM4309 asked BANI how many grams he could get for $300. UM4309 told BANI he wanted "three white for 60, and the best you can do for 300."

B.  On February 11, 2017, at approximately 11:47 a.m. (Session 352), BANI received an incoming call on Target Telephone #7 from (781) 985-4589, and spoke to UM4589. BANI said, "In how long would you be here, because I'm waiting for Mely, she's bringing some curtain [additive] for something he needs to do."

C.  On February 11, 2017, at approximately 12:40 p.m. (Session 356), BANI received an incoming call on Target Telephone #7 from (603) 827-2049, and spoke to UM2049. UM2049 asked if he could get "two things of white" and the rest "brown" for "200."

D.  On March 11, 2017, at approximately 10:29 a.m. (Session 1038), BANI received an incoming call on TT#7 from (978) 996-1664, and spoke to KEEFE. KEEFE said, "I was going to see if I could grab a gram." BANI said, "You want a gram?" They agreed on a place to meet, and SHAWN said he had his kids in the car and "I kind of got to be cool about it."

E.  On March 23, 2017, Shawn KEEFE, a redistributor for BANI, was arrested and five grams of suspected heroin/fentanyl was seized. Intercepted calls indicated that KEEFE sought to buy drugs from BANI (TT7: 3641, 3643, 3659, 3660, 3661). BANI told KEEFE where to meet him, and further calls set up the timing and place. Surveillance was established. A motor vehicle stop was conducted after KEEFE left the meet with BANI, and the operator was identified as KEEFE. A search of his person revealed approximately six grams of suspected heroin/fentanyl, and KEEFE admitted buying five grams of drugs for $200 in Lawrence. The five grams was packaged separately from a single gram, which single gram may have been a gift. KEEFE said he called (603) 205-5906 to order drugs (TT#7).

Based on my training and experience and knowledge of this investigation, the request for "white" means cocaine, and "brown" means heroin/fentanyl. BANI delivered drugs to KEEFE and others in the Lawrence area.

## **CONCLUSION**

While the information set forth above is only a small portion of the evidence against some of the defendants who have been charged in the three indictments, it provides a flavor of how the business-like nature of how these DTOs operated, the dangers presented by these defendants to Lawrence and surrounding areas, the fortune amassed through their drug businesses, and the utter disregard for the damage they are inflicting on the people in their own communities.

Signed under pains and penalties of perjury this 30th day of May, 2017.

_____
Garth Hamelin
Special Agent
U.S. Drug Enforcement Administration

21





CABALLITO
INDICTMENT
17-cr-10142-DJC

Drug Supplier
Jose Rosado Sanchez
a/k/a CHIQUITO

LEADER
Ramon Gonzalez Nival
a/k/a CABALLITO

Courier
Ruddy Rafael Soto Lara,
a/k/a Flor Saez, a/k/a Peje

Courier
Geronimo Confesor Gonzalez Nivar,
a/k/a Alexie

Redistributor
Diosmary Burgos

Manager
Julio Baez Gonzalez a/k/a
Manolo

Redistributor
Carlos Hernandez

Redistributor
Rory Connolly

Redistributor
Bernaldo Rosario-Santiago



BANI –
INDICTMENT
17-cr-10140-LTS

Drug Supplier
Caonabo Mayobanex Pol Montero
a/k/a BANI

Redistributor
Shawn Keefe